UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ERIK N. MUEHLENBEIN,

               Petitioner,

                                               CASE NO. 2:06-CV-11861

     v.                                 JUDGE GEORGE CARAM STEEH
                                               MAGISTRATE JUDGE PAUL KOMIVES

MILLICENT WARREN.

               Respondent,

_____/


REPORT AND RECOMMENDATION

*Table of Contents*

I.     RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
     A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
     B.    *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     C.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
     D.    *Claim I: Other Acts Evidence* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
          1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
     E.    *Claim II: Insufficient Evidence* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
          1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
     F.    *Claim III: Ineffective Assistance of Counsel* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
          1.    *Clearly Established Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
          2.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
     G.    *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
III.   NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

\*      \*      \*      \*      \*

I.     RECOMMENDATION:  The Court should deny petitioner's application for the writ of

habeas corpus.

II.    REPORT:

A.    *Procedural History*

       1.     Petitioner Erik N. Muehlenbein is a state prisoner, currently incarcerated at the

Correctional Facility in Michigan.

2.       On August 28, 2002, petitioner was convicted by a jury of one count of kidnapping,

MICH. COMP. LAWS §750.349, and two counts of first degree criminal sexual conduct, MICH. COMP.

LAWS § 750.520b.  On October 4, 2002, he was sentenced by Oakland County Circuit Judge Rudy

Nichols to concurrent terms of 285-720 months' imprisonment for each conviction.

3.        Petitioner thereafter filed an appeal of right in the Michigan Court of Appeals,

raising five issues:

I.       DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO DUE PROCESS AND A FAIR TRIAL WHERE HIGHLY PREJUDICIAL AND IRRELEVANT EVIDENCE OF A NON-VICTIM'S INJURIES WERE INTRODUCED TO THE JURY AS SUBSTANTIVE EVIDENCE OF A CRIME THAT WAS DISMISSED AGAINST DEFENDANT ON THE MORNING OF TRIAL.

II.      DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL DUE TO COUNSEL'S FAILURE TO OBJECT TO IRRELEVANT, PREJUDICIAL EVIDENCE, FAILURE TO PRESENT A DEFENSE, AND FAILURE TO OBJECT TO SENTENCING GUIDELINES SCORING ERRORS THAT BENEFITTED THE DEFENDANT.

III.     DEFENDANT WAS CONVICTED ON INSUFFICIENT EVIDENCE OF KIDNAPPING WHERE HE WAS INTOXICATED AND THEREFORE COULD NOT FORM THE REQUISITE INTENT TO COMMIT THIS CRIME.

IV.      DEFENDANT WAS CONVICTED ON INSUFFICIENT EVIDENCE OF FIRST DEGREE CRIMINAL SEXUAL CONDUCT WHERE THERE WAS SUBSTANTIAL EVIDENCE IN SUPPORT OF HIS DEFENSE OF CONSENT.

V.       DEFENDANT'S MINIMUM SENTENCE OF 23 YEARS 9 MONTHS IN PRISON REPRESENTS ERRONEOUSLY CALCULATED PRIOR RECORD VARIABLES TANTAMOUNT TO A DOUBLE VIOLATION AND REFLECTS THE SENTENCING JUDGE'S DESIRE TO PUNISH DEFENDANT FOR EXERCISING HIS CONSTITUTIONAL RIGHT TO JURY TRIAL.

The Michigan Court of Appeals rejected each of petitioner's claims, and affirmed his conviction and sentence. See *People v. Muehlenbein*, No. 244712, 2004 WL 110713 (Mich. Ct. App. May 18, 2004). Petitioner then sought leave to appeal all of these issues to the Michigan Supreme Court. On January 31, 2005 the Supreme Court denied petitioner's application for leave to appeal. See *People v. Muehlenbein*, No. 126521, 472 Mich. 861, 692 N.W.2d 386 (Mich. 2005).

4. On April 20, 2006, petitioner filed an application for the writ of habeas corpus in this Court, raising three claims:

I. PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHERE HIGHLY PREJUDICIAL AND IRRELEVANT EVIDENCE OF A NON-VICTIM'S INJURIES WERE INTRODUCED TO THE JURY AS SUBSTANTIVE EVIDENCE OF A CRIME THAT WAS DISMISSED AGAINST PETITIONER ON THE MORNING OF TRIAL.

II. PETITIONER WAS CONVICTED ON INSUFFICIENT EVIDENCE OF KIDNAPPING AND FIRST DEGREE CRIMINAL SEXUAL CONDUCT WHERE HE COULD NOT FORM THE REQUISITE INTENT TO KIDNAP BECAUSE HE WAS INTOXICATED AND HIS BELIEF THAT THERE WAS CONSENT FOR SEXUAL CONDUCT.

III. PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF THE SIXTH AMENDMENT.

5. Respondent filed his answer on October 30, 2006. He contends that petitioner's claims are without merit, and even if they are meritorious, they did not have a significant impact or influence on petitioner's trial.

B. *Factual Background*

Following are the unedited facts correctly summarized from the prosecutor's brief submitted to the Michigan Court of Appeals and also in respondent's brief submitted to this Court. The trial record has been correctly cited in these briefs.

Defendant, Erik Muehlenbein, was charged with five counts[1] of kidnapping contrary to MCL 750.349; three counts of first-degree criminal sexual conduct contrary to MCL 750.520b; and one count of assault with intent to do great bodily harm less than murder contrary to MCL 750.84. Prior to jury selection on August 22, 2002, the assistant prosecutor moved to dismiss the assault charge against this defendant, informing the court that he did not believe that he could prove the charge beyond a reasonable doubt. Following a jury trial, conducted by the Honorable Rudy Nichols, the defendant was convicted by the jury of kidnapping and two counts of criminal sexual conduct in the first degree. On October 4, 2002 Judge Nichols sentenced the defendant, within the guidelines, to concurrent terms of 23 year 9 months to 60 years in prison with credit for 241 days credit. Defendant now appeals as of right, raising five issues.

At trial, the People presented Ronald Tracy. Tracy was sleeping in his house on Myrtle Street in Waterford, on January 20, 2002 when he was awakened by people shouting and arguing. (T-II, 4). Tracy saw 4 people out in the street, approximately three houses down near Telegraph Road. He observed a car facing west with its headlights on. Something on the street was moving toward Tracy. This was apart from the "4" people that were outside the car. One person of the four moved toward the object on the ground and kicked the object violently. (T-II, 10). Tracy called 911 and returned to see the person on the ground still being kicked. (T-II, 11).

He then observed a second person from the car come over and kick the person on the ground. (T-II, 12). Tracy went to get dressed after seeing 4 or 5 more kicks to the person on the ground. (T-II, 14). Tracy was not available to identify the people that were kicking the person on the ground, and they left before he could get close enough to see anyone. He went over to the person on the ground, who was identified as Jeremiah Kelly. Kelly was in poor condition with extensive bleeding, and his face was swelling. There was a trail of blood in the snow that led up to Kelly. Kelly's pants were torn, his pockets were pulled out and he was missing a shoe. (T-II, 16-17).

Jeremiah Kelly was a 27 year-old who lived in Lake Orion. He described himself as 6' tall and weighing 285 pounds. Kelly was a friend of Clarissa Kritzman, the

---

[1] Two co-defendants were also charged in this matter Mohammad Hasan was charged with kidnapping and 8 counts of first degree criminal sexual conduct and assault with intent to commit great bodily harm less than murder. Co-defendant, Ali Tleis was charged with one count of kidnapping and 4 counts of first-degree criminal sexual conduct. Tleis pled no contest to the charges against him and was sentenced under a *Cobb's* plea to terms of 8-60 years concurrent. Hasan fled the jurisdiction. The People are seeking to return co-defendant, Hasan, to the United States for trial on the charges. [According to petitioner, Hasan has since returned to this country and has subsequently been tried and convicted for his role in this crime.]

victim in this matter. On January 19, 2002 Kelly went to the victim's home in Oxford. He had $800 on his person, divided between his wallet and his pocket. (T-II, 26-29). After making a stop at *Mr. B's* in Clarkston, Kelly and the victim decided to go to *Clutch Cargo's* in Pontiac so that the victim could dance to the different types of music. Kelly valet parked his car and went into *Clutch Cargo's* with the victim. Kelly testified that he drank five or six vodka and orange juices and one shot of Jaeger. The victim drank one or two more drinks than Kelly, who was buying the drinks. (T-II, 35). Kelly told the jury that he had never passed out from drinking before and that he usually can drink four times what he drank that night. The last thing he remembered was having a conversation with a man from Australia, and when he woke up it was 8:00 a.m. and he was in the hospital. (T-II, 35).

Kelly had no recollection of getting into a car, a cab or vomiting. He could not remember being treated by EMS or the beating that resulted in him being hospitalized. Kelly suffered a broken nose, two broken teeth, his lip ripped in half, a broken fibula, crushed tendons and ligaments in his ankle, stitches in his eyebrow, staples in the top of his head, blurred vision for 2-3 weeks and "road rash" on his stomach. (T-II, 36-37). He could see a boot or show pattern on his face and he had a steel plate and six grooves into his ankle to straighten out his fibula. (T-II, 40). All of Kelly's money was gone. (T-II, 43).

Don LaRoche was a host at Clutch Carogo's on the night of January 19, 2002. He remembered seeing the victim at the club that night and recalled that she was removed because she was intoxicated. (T-II, 58). Outside the club LaRoche offered the victim a coat to wear and a bottled water to drink. About a half-hour later he saw that Kelly was also removed from the club. (T-II, 62). LaRoche did not believe that Kelly was that intoxicated. A cab was called for Kelly and the victim. The cab would not accept the fare because Kelly was vomiting. A second cab was called, and while Kelly and the victim were waiting for the cab, Mohammed Hasan was removed from the club for fighting. Hasan was very aggressive, he took off his belt and wrapped it around his had and wanted to fight. (T-II, 66). Hasan and Kelly nearly came to blows before he (Hasan) was removed from the property. (T-II, 68). After another near fight, Hasan offered to give Kelly and the victim a ride home. (T-II, 70). Hasan put him arm around the victim, who reacted as if she was uncomfortable with this action. In response, she backed away from Hasan and moved toward Kelly. (T-II, 71-72). LaRoche had seen all three defendants in the club on previous occasions. (T-II, 73-74). Two weeks later LaRoche saw the codefedant, Tleis, at the club and notified the Pontiac officer detailed to the club. (T-II, 75).

Sandra Naime was at Clutch Cargo's with Tleis when Tleis was approached by the Pontiac police and asked for his identification. The next day Tleis went to Naime's work place and spoke to her. She was in the car with Tleis and another male when the Waterford police called. The officer spoke with Tleis and Naime. (T-II, 105). Naime and Tleis met defendant Muehlenbein at a gym in Dearborn. Defendant told

Tleis not to go to the police station. When the police called again, defendant got on the phone and identified himself as the older brother of Tleis and not as Erik Muehlenbein or Hassan Awada. Defendant told the Waterford officer that Tleis did not speak much English. (T-II, 107-108). Naime and Tleis both ended up going to Waterford to speak with the Detectives.

Clarissa Kritzman [the victim] was 25 years old and worked as a waitress while going to school at Oakland Community College. She was married (but separated) for nine years and was living with her children in Oxford, Michigan. On the weekend of January 19, 2002 she made arrangements to go out with a friend, Jeremiah Kelly. The two went to *Mr. B's* in Clarkson and had a drink. They left and made their way to *Clutch Cargo's* in Pontiac. Kritzman had five or six drinks in four hours while dancing at the club. (T-II, 134). While waiting for Kelly to use the restroom, staff at the culb told her that she had to leave because she was too intoxicated. She waited outside the club where she was approached by codefendants, Tleis and Hasan. Two cabs turned down fares from Kritzman and Kelly because of the condition that Kelly was in. Hasan offered the victim and Kelly a ride home. The group walked to a black Grand Am where they met the defendant, Muehlenbein. The victim sat in the front seat, Hasan got in the drivers seat and defendant, Tleis and Kelly sat in the back seat. (T-II, 141). After driving for a short distance, Hasan stopped the car to allow Kelly to throw-up. As Kelly stepped out of the car, Hasan stepped on the gas causing Kelly to fall out of the moving vehicle, and Hasan drove over Kelly's leg. (T-II, 144). The victim jumped out of the car and started screaming. Hasan stopped the car, got out ran over to Kelly, and started kicking him. Hasan kicked Kelly numerous times, and the victim continued to scream for him to stop. Tleis was holding the victim, defendant then got out of the car, walked around to where Kelly was laying on the ground. The victim was then shoved back into the car. (T-II, 145-146). The victim was screaming to be let go. She estimated that she must have repeated her plea to be let go over 100 times. (T-II, 148). Instead she was pushed onto the floor of the car. Hasan drove the car, one of the other two sat in the back seat and the other sat in the front seat. The front seat was put down to hold her on the floor. The victim was unsure if Tleis or defendant was in the backseat.[2] (T-III, 85).

The car was stopped in an alley behind a small white house with plank steps. The victim was taken into the house that was filled with garbage. There was a stink from the house and just a path to walk through. (T-II, 159). Hasan told the victim that they were going to smoke a joint to chill out and Tleis told the victim to sit down on the couch. The victim was afraid because of what had happened to Kelly, but still

---

[2] [Kritzman, the victim, testified that after she was shoved back in the car, petitioner did state, "Can I go home yet," both in the car and at the house. *See* Jury Trial Tr., dated 8/23/02, at 154, 161.]

kept asking to go home. (T-II, 162). Although she tried to use the bathroom Hasan would not allow her to close the bathroom door. Hasan continuously pulled at her pants and wanted her to do something with [him]. (T-II, 164, 169). When she kept asking to be taken home, Hasan punched her in the mouth, splitting her lip and causing her head to hit the back of the door. The victim thought that defendant was next to Hasan when he delivered the punch. (T-II, 166).

Tleis told the victim to go along because "Moe (Hasan) is crazy." Tleis suggested that the victim go into the bedroom with him and then Moe would leave her alone. The victim changed her approach because she was afraid she was going to die. (T-III, 10). Tleis took the victim into the bedroom and had the victim tell him about herself. Hasan then came into the bedroom. Hasan started to wrestle with the victim and grabbed her purse when her phone beeped. Hasan then ripped off the purse by breaking the strap. Hasan took the purse into the living room while the victim stayed in the bedroom with Tleis. Five minutes later Hasan returned and decided that the victim's pants and boots had to come off. The victim told Hasan no and asked to be left alone. She was screaming at him to get off of her. Hasan told the victim to hold still or things were going to get really bad. (T-III, 14). Hasan took off the victim's pants, boots and panties and pushed her knees up to her ears and performed cunnilingus on the victim, while Tleis was standing next to the bed. (T-III, 14).

Hasan then put his penis in the victim's vagina. She testified that the defendant came and stood at the door near the end of the bed. (T-III, 16). The victim was crying, but trying not to be too loud because of the threats to hit her by Hasan. Tleis was on the side of the bed. Hasan then climbed on the victim's chest and told Tleis "to pound that pussy," who took Hasan's place and put his penis into her vagina without her consent and against her will. Hasan who was sitting on her chest then put his penis in the victim's mouth. Defendant, Muehlenbein, was standing at the end of the bed during this time. (T-III, 17). Hasan then got off the victim's chest and told defendant that it was his turn. (T-III, 18). Defendant climbed up and put his penis into the victim's vagina. Although the victim still had on her sweater and bra defendant pushed the clothing up while the victim kept pushing it down. Defendant moved her hands, pushed up the clothing and licked the victim'[s] breast. (T-III, 20). She did not consent to these actions with the defendant or tell him it was ok to do this. In fact, the victim was crying and her lip was bleeding. Hasan, standing on the side of the bed, kept encouraging Muehlenbein. (T-III, 21).

The victim testified that the three kept switching places and taking turns having sexual intercourse with the victim. She believed that defendant had intercourse with her three times, Tleis three times and Hasan numerous times. (T-III, 22-23). The victim explained that her head felt like it was going to explode, her lip was bleeding and she was crying. (T-III, 24). She thought that she was held in the house bedroom for about three hours. (T-III, 25). According to the victim, defendant Muehlenbein was awake from the time of Kelly's beating on the street in Waterford. (T-II, 25).

When the defendants were through, the victim moved to the end of the bed to look for her clothes. When she stood up and fluid ran out of her, all three defendants laughed and said, "look what we did." She found her clothes except for her underwear. She moved to the living room and pleaded for her things, including her phone. The lights were on, disclosing that her lip had swelled up, her makeup had run down her face. All three were in the living room as the victims repeatedly asked to be taken home. Hasan and Tleis went into the bedroom and talked for a few minutes and then came out and gave the victim her phone back. Defendant, Muehlenbein went outside and moved the car. All three took the victim out to the car with a promise to take her home. (T-III, 262-9).

Hasan again drove with defendant in the passenger front seat; Tleis sat in the back with the victim. After driving around for a while they pulled into park next to the Detroit River near the Ambassador Bridge. The victim thought that she was going to be thrown into the river, but another car was in the lot. Hasan then drove to Belle Isle. (T-III, 30-31). The victim kept asking where they were going and wanted to go home. Tleis wanted to make small talk and gave the victim a phone number to program into her cell phone. Once on Belle Isle, Hasan demanded the victim's phone and ordered her out of the car. (T-III, 31). When the victim exited the car Hasan gave her cell phone back and told her to dial a number. As she began to dial the number, Hasan punched her in the jaw, knocking her into the car. Hasan grabbed the victim by her hair and pulled her toward the water. The victim fought back and Hasan responded by smashing her face into a tree. (T-III, 34-35). The victim pretended that she was dead and Hasan left her lying on the ground. She heard Tleis and defendant scream out "what did you do, you killed her." (T-III, 36). All three then got into the car and left the victim lying at the base of the tree, in the middle of the night in January.

As soon as she was sure that the three had left, the victim called 911, trembling and terrified, bleeding from the head wound. (T-III, 37). She was taken to the Detroit Police Department and interviewed. From there an ambulance took her to St. Joseph's Hospital in Pontiac. There she received 5 stitches in the head and treatment for the cuts and bruises. (T-III, 43). A specially trained nurse conducted a test for pregnancy and evidence of sexual assault. (T-III, 43-35). As a result of the attacks, the victim is scared to be left alone or to be in the dark. She has anxiety attacks every morning. (T-III, 69).

Darby Creger, the program director for START,[3] and a forensic nurse examiner in the program, conducted the examination of the victim. During the physical exam of the victim, she looked over every inch of the victim's body with the benefit of the

---

[3] START is an acronym for Safe Therapeutic Assault Response Team

medical history collected by the emergency room physician. She is responsible for collecting the physical evidence from the victim's body. (T-III, 125-130). Her report listed the injuries on the victim's body and the results of the examination of the victim's genital exam. Creger concluded her findings, and informed the jury she took swabs of the victims's vagina, cervical area, breast, and anal area. She secured a blood sample and pulled hairs from the victim's head, and pubic region. This evidence was placed in a kit and given to the police for analysis. (T-III, 140-143).

On February 5, 2002 Detective Ryner interviewed Sandra Naime at the Waterford Police Station. Following the interview he arrested the co-defendant, Ali Tleis. Ryner began trying to locate a Mohammad Hasan and Hassan Awada. (T-III, 160). Ryner located Awada on S. Morrow Circle in Dearborn Michigan. Tleis agreed to take the Detective to the house of Mohammad Hasan in River Rouge where the assault had occurred. (T-III, 163). Arriving at 58 Hill Street in River Rouge, Ryner secured a search warrant for that location. He then went to South Morrow Circle in Dearborn. In front of the house that Tleis pointed out as the home of Awada, was a black Grand Am. Defendant, Muehlenbein, answered the door and identified himself as Hassan Awada. (T-III, 168). He gave a picture ID of Erik Muehlenbein to Detective Ryner, and explained that in his community, he was known by the name of Hassan Awada, while his legal name was Muehlenbein. Defendant was transported to the Waterford Police department, and later to the Oakland County jail where a corpor[e]l lineup was held, during which the victim identified him as one of her assailants. (T-III, 172). Ryner also conducted a photo lineup with the victim, where she identified the photo of Mohammad Hasan as one of her attackers.

Officer Brian Asbridge processed the search warrant at the Hill Street address in River Rouge. He described the house as a one story small house with two bedrooms, a living room and a kitchen. From the house he recovered a green bed sheet and transported the evidence to the Michigan State Police crime bag. He also collected the floor mats and hairs from the Grand Am and sent those samples to the crime lab along with hair and saliva samples from the defendant and co-defendant, Tleis. (T-III, 194).

The forensic scientist from the State Police Crime Lab, David Woodford was qualified as an expert in serology and hair analysis. He determined that there was seminal fluid and or sperm on man[n]y of the items[4] recovered by the Waterford Police Department. Woodford found blood on the victim's blue jeans, bra, blouse, and on a note that was in the victim's sweater. (T-III, 216).

---

[4] Including the vaginal swab, the vaginal smear contained sperm; seminal fluid was located on the external genitalia, the internal genitalia, and the cervical swabs. Semen was found on the left breast swab and seminal fluid was located on the victim's blue jeans, black sweater, the green sheet and on the rectal swab. (T-III, 212-215).

Hair found in the Grand Am was consistent with the victim's hair. (T-III, 219-220). The evidence was then forwarded to the Northville lab for DNA testing. (T-III, 222).

Dorothy Martus was qualified as an expert in DNA analysis and testified that she received known samples for the victim, Jeremiah Kelly, defendant, Muehlenbein and codefendant, Tleis. She tested the known samples with the vaginal swabs, the left breast swabs and samples from the black sweater. The DNA from the vaginal swab and the sweater were from the same male and did not match the known samples. The swab from the left breast swab matched the defendant's DNA profile. (T-III, 236).

The parties stipulated that Waterford Police Officer Waliskowski responded to Myrtle and Telegraph on January 20, 2002, and found Jeremiah Kelly covered in blood and highly intoxicated. Kelly told the officer that his friends beat him up after he drank a case of beer. Kelly told the officer that he wanted to be left alone. Kelly was then transported to Pontiac Osteopathic Hospital during which he repeated his claims to the EMS worker. The People then rested.

The defense called Officer Donald Gracey from the Pontiac Police Department who was working a detail at *Clutch Cargo's* on January 20, 2002. He saw the victim and a Hispanic male in what he described as "a romantic hug." (T-IV, 12).

The defense then called a string of character witnesses, starting with 20 year old Anna Mauer, a former girlfriend of the defendant, who was at Clutch Cargo's on January 20, 2002. She testified that she saw the defendant at the bar around 10:45 p.m. and spent the next three hours with him dancing, talking and kissing, until 1:45 when she left the bar. (T-IV, 27). She did not see the defendant drinking at the bar at all the evening, and she described him as a gentleman, very polite. She indicated that people look up to the defendant and everyone listens to what he has to say. (T-IV, 30).

Defendant then called his Uncle, Nadim Awada to testify. Awada was the owner of the vehicle (Grand Am) that the defendant uses and he is also the defendant's employer. As part of his employment, defendant often drives to different states. (T-IV, 53). He described defendant as nonviolent and kind hearted, a helpful person. The type of person that would not distort the truth, although Awada admitted that he would do all he could to help his nephew. (T-IV, 60). Awada was unaware that defendant told Tleis to lie to the police and was not aware that defendant lied to the Waterford officer and told the officer that he (defendant) was Tleis brother and that Tleis did not speak much English. (T-IV, 75).

Karen Kanda, a co-worker of the defendant's and a friend of the defendant's who socialized with him including a time as boyfriend/girlfriend, told the jury that defendant has a reputation as a very innocent caring human being, who is well

respected and very proper. In fact, Kanda insisted that she had never known the defendant to do anything improper, always a gentleman and never violent. A fourth witness, the friend of defendant's aunt, Theresa Meyer described defendant as laid back and nonaggressive. He would not be the type of person to lie. (T-IV, 92).

Defendant took the stand and explained that he knew codefendant, Hasan from school and the other codefendant, Tleis for the last year. He also told the jury that he had a prior misdemeanor conviction for assault and battery and was on probation for loitering in a house where narcotics are kept. (T-IV, 99). On January 19, 2002 he went to a party store for three 40-ounce beers that he purchased. He drank his in the car on the way to *Clutch Cargo's*. He denied using drugs that evening, but claimed that he was feeling the effects of the alcohol. (T-IV, 101-102). Defendant claimed that he did not purchase any drinks while in the bar and that he left around 1:30 feeling drunk. According to the defendant, when he arrived at his car Hasan was on the driver's side, the victim was on the passenger side and Kelly and Tleis were in the back seat. (T-IV, 110-111). Defendant remembered getting into the backseat, and recalled that the victim and Hasan kissed while sitting in the front seat. The next thing that he remembered was Hasan beating Kelly.[5] (T-IV, 114). Defendant claimed that he did not remember anything further until he arrived at Hasan's home in River Rouge, where Hasan told him to park the car. Despite his drunken stupor, defendant was able to drive the car. He did not recall the victim ever crying or asking to be taken home. (T-IV, 188, 120). Although he never went behind Hasan's house, he did not think that it was unusual. (T-IV, 119). Defendant went into the house, where again he did not recall anything until Hasan called him into the bedroom. Inside the bedroom defendant saw Tleis having intercourse with the victim while Hasan was having oral sex with the victim. (T-IV, 123). Defendant claimed that the victim was completely naked and that she initiated sex with him. He did not wear a condom and claimed that he had intercourse with the victim while Hasan was having oral sex with her. Tleis was watching from the side of the bed. (T-IV, 126). Defendant denied being able to see the victim's face, or ever seeing any injuries on the victim. He alleged that she was not crying or that anyone had hit her. He admitted that he had intercourse with the victim two times and took his second turn after Tleis' second time. (T-IV, 129). After his second round on the victim, defendant went and sat in a chair in the living room where he got dressed. The two other defendants were still in the bedroom having sex with the victim, when Hasan told the defendant to go and start the car. (T-IV, 132).

Once back in the car, defendant again alleged that he could not see the victim's face and the obvious damage that had been done. Defendant was in the front passenger

---

[5] [Petitioner did testify that he told co-defendant Tleis to, "Go stop him," (referring to Hasan when Hasan was beating Kelly) because he felt too "drunk and woozy" to do it himself. *See* Jury Trial Tr., dated 8/27/02, at 115.]

seat and the victim was in the back seat. He was able to see that she was holding a phone and that the phone was a silver Sprint phone. (T-IV, 137-138). Hasan drove to Belle Isle where he ordered the defendant out of the car.[6] Defendant did not recall Hasan hitting the victim, or ramming her head into a tree. His testimony was that Hasan just left the victim outside the car. When defendant asked what Hasan was doing, Hasan responded by telling defendant not to worry about it, twice. In fact, this gentleman who was polite to everyone and would go out of his way to move a garbage can responded by saying "Okay, whatever guy." (T-IV, 143). From leaving the victim on Belle Isle in the dark on a cold January day, defendant and the codefendants went to a Ram's Horn for coffee. Defendant admitted that he answered a phone call from the Waterford Police Department, where he identified himself as the brother of codefendant Tleis. (T-IV, 148).

Defendant bragged that he was not scared of anyone, including either of the two codefendants. (T-IV, 158). Defendant knew about Hasan having a rape charge prior to going to *Clutch Cargo's*. (T-IV, 161). Defendant also testified that his attorney was wrong when in opening statement he (counsel, T-I, 158) stated that he (defendant) saw Hasan saw the punch in the jaw at Belle Isle and the ramming of the victim's head into the tree. Defendant claimed that he did not see any of this, even though he did not claim that he was passed our or sleeping while on Belle Isle. (T-IV, 162). Defendant did acknowledge that he saw Hasan kicking Kelly and heard the victim asking why Hasan was doing that to Kelly. (T-IV, 114, 167). After seeing the beating of Kelly by Hasan, defendant claimed that he couldn't do anything about it and that he could not be concerned about what happened to Kelly.[7] (T-IV, 173, 176).

Defendant's thoughts about the whole episode is summed up by his own words "Well, I mean if a girl is willing to do something like that I, I'm not gonna sit there and say, oh no, don't" (T-IV, 192). He never asked the victim her name or phone number and never gave his phone number to her. In fact, defendant does not give out his phone number to any girl; "especially one I have sex with." (T-IV, 195). Following defendant's testimony the defense rested.

Appellee's Br. on Appeal. in *People v. Muehlenbein*, No. 1103713 (Mich. Ct. App.), at 5-13.

Based on this evidence, petitioner was convicted on the kidnapping charge and two counts of first

---

[6] [The word "defendant" used in this sentence seems to be a typo; the record indicates that Hasan ordered the victim out of the car. *See* Jury Trial Tr., dated 8/27/02, at 139.]

[7] [When petitioner was asked about his concern for Kelly, petitioner's actual statement was, "I was passed out. I really couldn't be concerned." *See* Jury Trial Tr., dated 8/27/02, at 174.]

degree criminal sexual conduct. He was sentenced to a term of 23 years and nine months to 60 years with credit for 241 days.

C.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court

to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases—indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the

decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.      *Claim I: Other Acts Evidence*

Petitioner contends that he was denied his right to due process and a fair trial because the court allowed pictorial and testimonial evidence of the assault injuries sustained by Jeremiah Kelly to be admitted at trial even though the prosecution dismissed the assault charge against petitioner on the morning of trial. Petitioner claims that the evidence of Kelly's injuries was produced only to inflame and prejudice the jury against him. At trial, counsel did not object to admission of this evidence because the defense strategy was to shift the blame of both the assault and the kidnapping to petitioner's codefedants, Hasan and Tleis, by showing that defendant was sleeping in the car when Kelly was assaulted and Kritzman was kidnapped.[8]

1.      *Clearly Established Law*

Unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional violation. *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987). "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law. State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law

---

[8] Testimony provided by Kritzman contradicted the petitioner's claim that he was sleeping. *See* Jury Trial Tr., dated 8/23/02, at 149.

itself violates the Constitution." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993). As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994); *see also, Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (federal habeas courts have no authority to interfere with perceived errors in state law unless the petitioner is denied fundamental fairness in the trial process).

In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy." *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

2.      *Analysis*

The issue before this Court is not whether this evidence was properly admitted under the Michigan Rules of Evidence, but whether petitioner was denied a fair trial by the introduction of this evidence. This being the case, petitioner is not entitled to habeas relief even if the evidence was not properly admitted under Rule 404(b). Both the Supreme Court and the Sixth Circuit have repeatedly held that a defendant is not denied a fair trial by the admission of prior bad acts evidence which is relevant in the defendant's trial. *See Estelle*, 502 U.S. at 69-70; *Dowling v. United States*, 493 U.S.

16

342, 353-54 (1990); *Coleman v. Mitchell*, 268 F.3d 417, 439-40 (6th Cir. 2001); *Pennington v. Lazaroff*, 13 Fed. Appx. 228, 232 (6th Cir. 2001) (per curiam) (unpublished); *Manning v. Rose*, 507 F.2d 889, 893-95 (6th Cir. 1974). In this case there was evidence that petitioner was not sleeping during the assault of Kelly, *see* Jury Trial Tr., dated 8/23/02, at 146-150, there was evidence that petitioner participated in the assault, *see* Jury Trial Tr., dated 8/23/02, at 7-15; Jury Trial Tr., dated 8/23/02, at 146-150, and there was evidence that this event precipitated the kidnapping of Kritzman. This evidence was therefore relevant to provide the jury with the full context as to the circumstances of the crimes which followed.

In this case the jury was called upon to determine whether petitioner aided in the kidnapping of Kritzman and later raped her. As noted in *People v. Sholl*, 453 Mich. 730, 742 556 N.W.2d 851, 857 (1996), "It is the nature of things that an event often does not occur singly and independently, isolated from all others, but, instead is connected with some antecedent event from which the fact or event in question follows as an effect from a cause. When such is the case and the antecedent event incidentally involves the commission of another crime, the principle that the jury is entitled to hear the 'complete story' ordinarily supports the admission of such evidence." Further, Kelly was Kritzman's escort for the evening; petitioner's defense to the charge that he raped Kritzman is that she consented. Evidence of the injuries sustained by Kelly when he was assaulted (and which Kritzman witnessed prior to her being kidnapped and prior to any sexual encounter that she had that night) may have led a reasonable jury to believe that it was less probable that Kritzman consented to having sex with petitioner than that she was raped by him.

Further, even if the evidence of the assault of Kelly was deemed irrelevant, the issue here is not whether the admitted evidence was irrelevant, but whether the evidence of the injuries

sustained by Kelly was so prejudicial that petitioner's constitutional right to a fair trial was violated by its admittance. "To constitute a denial of fundamental fairness, the evidence erroneously admitted at trial must be material in the sense of a crucial, critical, highly significant factor. *Jameson v. Wainwright*, 719 F.2d 1125, 1127 (5th Cir. 1983). If irrelevant evidence is admitted, the "weight and strength of the evidence" submitted against the defendant in regards to the crimes with which he is charged must be examined to determine whether it was the irrelevantly admitted evidence that swayed the jury to convict the defendant. *See People v. Mateo*, 453 Mich. 203, 215, 551 N.W.2d 891, 896 (1996). Examination of the record shows that if error was committed in the admission of the evidence of the assault of Kelly, it was harmless. Even without this evidence there was strong and persuasive evidence before the jury that would have resulted in convictions on both the charge of kidnapping and the charge of rape. Thus, there was no denial of any constitutional right to a fair trial.

E.      *Claim II: Insufficient Evidence*

Petitioner next contends that prosecution presented insufficient evidence to establish beyond a reasonable doubt the elements of kidnapping and first degree criminal sexual conduct. First, he contends, there was insufficient evidence presented for a rational trier of fact to find beyond a reasonable doubt the elements of aiding and abetting the kidnapping of Kritzman. He further maintains that kidnapping is a specific intent crime and that because he was intoxicated he could not form the requisite intent to commit the crime. Second, petitioner claims that but for the "irrelevant" evidence of the injuries sustained by Kelly being presented, his argument that Kritzman consented to petitioner's sexual penetrations would have prevailed. The Court should conclude that petitioner is not entitled to habeas relief on either of these claims.

1.      *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970).  Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  Reviewing courts must view the evidence, draw inferences, and resolve conflicting inferences from the record in favor of the prosecution.  *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992).  In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence.  *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993).

However, under the amended version § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision.  Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F. Supp. 2d 103, 106 (D. Mass 1998).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, *see Jackson*, 443 U.S. at 324, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691

(1975). Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

Under Michigan law when this crime occurred,[9] MICH. COMP. LAWS § 750.349 provided:

Any person who willfully, maliciously and without lawful authority shall forcibly or secretly confine or imprison any other person within this state against his will, or shall forcibly carry or send such person out of this state, or shall forcibly seize or confine, or shall inveigle or kidnap any other person with intent to extort money or valuable thing thereby or with intent either to cause such person to be secretly confined or imprisoned in this state against his will, or in any way held to service against his will, shall be guilty of felony, punishable by imprisonment in the state prison for life or for any term of years.

In *People v. Wesley*, 421 Mich. 375, 383, 365 N.W.2d 692, 694 (1984) the court held that "[t]he 'intent section' of the [kidnapping] statute applies only to the form of conduct which immediately precedes it." Thus there is no specific intent requirement for the section of the "statute which prohibits any person from 'forcibly or secretly confin[ing] or imprison[ing] any other person within this state against his will'. . ." *People v. Jaffray*, 445 Mich. 287, 299 519 N.W.2d 108, 113 (1994) (quoting MICH. COMP. LAWS §750.349). Furthermore, one who counsels, aids or abets in the commission of a crime may be convicted and sentenced as if he had directly committed the crime

---

[9] In May of 2006 the MICH. COMP. LAW § 750.349 was rewritten and now provides: (1) A person commits the crime of kidnapping if he or she knowingly restrains another person with the intent to do 1 or more of the following: (a) Hold that person for ransom or reward. (b) Use that person as a shield or hostage. (c) Engage in criminal sexual penetration or criminal sexual contact with that person. (d) Take that person outside of this state. (e) Hold that person in involuntary servitude. (2) As used in this section, "restrain" means to restrict a person's movements or to confine the person so as to interfere with that person's liberty without that person's consent or without legal authority. The restraint does not have to exist for any particular length of time and may be related or incidental to the commission of other criminal acts. (3) A person who commits the crime of kidnapping is guilty of a felony punishable by imprisonment for life or any term of years or a fine of not more than $50,000.00, or both. (4) This section does not prohibit the person from being charged with, convicted of, or sentenced for any other violation of law arising from the same transaction as the violation of this section.

20

MICH. COMP. LAWS §767.39.   Aiding and abetting under Michigan law requires proof of three elements: (1) commission of the underlying crime either by the defendant or some other person; (2) acts or encouragement by the defendant which aided or assisted the commission of the crime; and (3) intent on the part of the defendant to commit the crime or knowledge by the defendant that the principal intended to commit the crime at the time aid or encouragement was given.  See *People v. Acosta*, 153 Mich. App. 504, 511-12, 396 N.W.2d 463, 467 (1989) per curiam; see also, *Warren v. Smith*, 161 F.3d 358, 361 (6th Cir. 1998) (to establish aiding and abetting under Michigan law, " the prosecution must establish that the aider and abettor himself possessed the required intent or participated while knowing that the principal possessed the required intent.").   Aiding and abetting describes "all forms of assistance rendered to the perpetrator of a crime.  This term comprehends all words or deeds which may support, encourage or incite the commission of a crime."  *People v. Palmer*, 392 Mich. 370, 378, 220 N.W.2d 393, 397 (1974).  The advice, aid, or encouragement may amount to very little and still qualify as aiding and abetting; it is not necessary that it be essential to the successful commission of the crime.  *See id.*

2.      *Analysis*

Petitioner claims that because he was voluntarily intoxicated, he could not have formed the requisite intent to kidnap Kritzman.  In rejecting petitioner's argument that kidnapping is a specific intent crime the Michigan Court of Appeals explained that,

> Voluntary intoxication is no defense to a general intent crime, *People v. Langworthy*, 416 Mich. 630, 638; 331 NW2d 171, 173 (1982), and  a showing of specific intent is not required for "forcible confinement or imprisonment of another within this state," *People v. Jaffray*, 445 Mich. 287, 298; 519 NW2d 108, 113 (1994).  Therefore, this issue has no merit.

This interpretation of state law is binding in this habeas proceeding.  *See Chapman v. LeMaster*, 302

F.3d 1189, 1196 (10th Cir. 2002); *cf. Jackson*, 443 U.S. at 324 n.16.

Petitioner also argues that the prosecution presented insufficient evidence to establish that he aided and abetted the kidnapping of Kritzman. However, petitioner was not only in the car the night Kritzman was kidnapped, the car used to kidnap her had been entrusted to petitioner by his uncle. Petitioner allowed the principal defendant to drive the car and ultimately to use the car to kidnap Kritzman. Even though petitioner testified that he was sleeping from the time of the assault of Kelly until they arrived at the house, *see* Jury Trial Tr., dated 8/27/02, at 113-120, Kritzman's testimony contradicts this claim. *See* Jury Trial Tr., dated 8/23/02, at 146-158. Further, once they arrived at the house, petitioner testified that, under the direction of the principal defendant, petitioner moved the car which was used to kidnap Kritzman from the back of the house where Hasan, Kritzman, and Tleis entered, to the front of the house where petitioner, after knocking on a locked front door, entered. *See* Jury Trial Tr., dated 8/27/02, at 117-119. Viewing this evidence in a light most favorable to the prosecution, there was more than sufficient evidence for a rational trier of fact to find proven beyond a reasonable doubt that petitioner aided and abetted the kidnapping of Kritzman.

Next, petitioner argues that Kritzman consented to have sexual intercourse with him; he claims that she did not say "no" and that she did not ask him to stop. In fact, petitioner testified that Kritzman, "ended up pulling me into her when, once I got back to the bed from undressing. She had her, she put her legs around my back and I, she ended up grabbing my, my member and she ended up putting it near her thing and told me to push in." *See* Jury Trial Tr., dated 8/27/02, at 125-126. Petitioner also testified that prior to having sex with Kritzman, when he initially entered the bedroom he saw Hasan on his knees on top of her chest and the other co-defendant, Tleis, simultaneously having vaginal sex with her. *See* Jury Trial Tr., dated 8/27/02, at 123. Although petitioner maintains

that he was sleeping up until he was called to the room to have sex with Kritzman, *see* Jury Trial Tr., dated 8/27/02, at 120-121, Kritzman testified that petitioner was awake when she was hit in the face by Hasan. *See* Jury Trial Tr., dated 8/26/02, at 14-20. And, although petitioner testified to not having heard it, *see* Jury Trial., dated 8/27/02, at 127-128, Kritzman testified that she was initially screaming when Hasan first attacked her (until she was told, "You either hold still or things gonna get really bad.") in the bedroom, that her make-up was observably smeared from her tears, that her lip was bleeding from the blow she suffered from Hasan prior to her sexual encounter with petitioner, and that petitioner was at the end of the bed watching when the other two defendants sexually assaulted her. *See* at 14-20. Further, Kritzman stated that while petitioner was having sex with her and even though Kritzman tried to hold her shirt down, petitioner ultimately pushed her hands out of the way and licked her breast (which DNA evidence verified, *See* Jury Trial Tr., dated 8/26/02, at 238), and that she never consented to any touching or sexual intercourse with petitioner. *See* Jury Trial Tr., dated 8/26/02, at 14-20. Kritzman's testimony, if believed by the jury, was sufficient to rebut petitioner's consent defense beyond a reasonable doubt. *See United States v. Tsinnijinnie*, 91 F.3d 1285, 1289 (9th Cir. 1996); *see also*, *United States v. Mejia*, 909 F.2d 242, 245 (7th Cir. 1990); *Holderfield v. Jones*, 903 F. Supp. 1011, 1017 (E.D. La. 1995).

Petitioner further argues that the Michigan Court of Appeals did not address the merits of his sufficiency of the evidence claim for the first degree criminal sexual conduct (CSC I) charge, but rather changed it to a credibility issue. Petitioner is correct that the Michigan Court of Appeals did reason that because petitioner was not denying that there was evidence presented at trial that Kritzman did not consent, *see* Jury Trial Tr., dated 8/23/02, at 14-27 and testimony provided from petitioner that he believed she did consent, *see* Jury Trial Tr., dated 8/27/02, at 123-133 that,

"Defendant's argument regarding whether the defense of consent should have prevailed implicates the assessment of credibility." *Muehlenbein*, 2004 WL 1105713, at *2, slip op. at 2. But, when the court recognized this as a "credibility" issue and stated that it would give deference to the jury's decision, the court also explained that, "'[i]n sufficiency of the evidence claims, this Court reviews the evidence in the light most favorable to the prosecution and determines whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt.'" *Id.* (quoting *People v. Fennel*, 260 Mich. App 261, 270; 677 NW2d 66, 71 (2004). The court of appeals's statement regarding credibility was merely a formulation of the well-established rule that a court reviewing a sufficiency of evidence claim does not weigh the credibility of the witnesses and views the facts in the light most favorable to the prosecution. *See Jackson*, 443 U.S. at 319. Accordingly, this Court should also conclude that there was sufficient evidence from which a reasonable jury could conclude that petitioner criminally sexually assaulted Kritzman in the first degree and that this determination was a reasonable application of the *Jackson* sufficiency of the evidence test in light of the evidence offered at trial. Thus, this Court should find that petitioner is not entitled to habeas relief on this claim.

F.      *Claim III: Ineffective Assistance of Counsel*

        Petitioner next raises two ineffective assistance of counsel claims. Specifically he contends that his trial counsel was ineffective because he did not object to the presentation of detailed evidence of the injuries sustained by Kelly. Further petitioner argues that trial counsel was ineffective because he did not request a jury instruction on voluntary intoxication. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

        1.      *Clearly Established Law*

The Sixth Amendment right to counsel and the corollary right to effective assistance of counsel protect the fundamental right to a fair trial. See *Strickland v. Washinton*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *See id.* at 687. These two components are mixed questions of law and fact. *See id.* at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

With respect to the performance prong of the Strickland test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id.* at 689; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. With respect to the prejudice prong of the *Strickland* test, the ultimate inquiry is "whether there is a responsible probability that, absent [counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

2.    *Analysis*

Petitioner contends that his trial counsel was constitutionally ineffective in two respects. As addressed in Claim I above, petitioner contends that failure of trial counsel to object to the evidence

presented of the injuries sustained by Kelly served to prejudice the jury against him. Second, petitioner contends (as addressed in Claim II above) that kidnapping is a specific intent crime, and thus because he was voluntarily intoxicated, he could not have formed the requisite intent to commit the crime.

In its opinion, the Michigan Court of Appeals noted that in order for a defendant to claim that his counsel's failure to object resulted in ineffective assistance of counsel a defendant has to "overcome the presumption that his counsel's actions were the result of sound trial strategy." *Muehlenbein*, 2004 WL 1103713, at *1, slip op at. 2. (construing *People v. Stanaway*, 446 Mich. 643, 687, 521 NW2d 557, 579 (1994)). The Court went on to resolve the claim that petitioner's counsel was ineffective because he did not object to evidence of the assault on Kelly by stating:

> Here, defendant asserts that his trial counsel was ineffective because he failed to object to the evidence concerning the victims's friend's injuries. However, the defense strategy, as demonstrated in the opening statement, was to show that defendant was sleeping in the car during the events leading up to the conduct for which defendant was charged, including during the kidnapping of the victim, and to shift the blame to the codefendant, Mohammed Hassan, who "is a bad guy" and who had fled the country. Defendant's counsel's choice not to object to the testimony regarding the beating of the victim's friend could reasonably have been made in furtherance of that trial strategy. We will not second-guess counsel's strategic decision.

Further, although petitioner alleges that prejudice arose from his attorney's failure to object to presentation of the evidence of the assault of Kelly, this Court should conclude, as discussed above, that the evidence was properly admitted as part of the "complete story" of the crime. Thus, any objection would have been futile, and counsel was not ineffective for failing to raise a meritless objection. *See Anderson v. Goeke*, 44 F.3d 675, 680 (8th Cir. 1995).

Finally, petitioner's claim that "there is a reasonable likelihood" that the jury would have acquitted him of the kidnapping offense if his trial counsel had requested an instruction on the

defense of voluntary intoxication is simply without merit. As addressed in Claim II, when this crime occurred, the type of kidnapping that petitioner was accused of only required a general intent.[10] Because voluntary intoxication is not a defense to a general intent crime, petitioner cannot show that his counsel was ineffective for failing to raise it as a defense at trial. Accordingly, the Court should conclude that petitioner is not entitled to relief on this claim.

G.      *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.      NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2),

_____

[10] As addressed under Claim II, "[a] showing of specific intent is not required for forcible confinement or imprisonment of another within this state," *People v. Jaffray*, 445 Mich. 287, 298; 519 NW2d 108 (1994).

a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 7/10/07

The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on July 10, 2007.

s/Eddrey Butts
Case Manager